**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| MELISSA A. ARNOLD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3248 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Melissa A. Arnold appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits). 42 U.S.C. §§ 416(i), 423, 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Arnold filed a Brief in Support of Motion for Summary Judgment (d/e 16) (Brief). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19). The parties have consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered March 14, 2018 (d/e 13).

For the reasons set forth below, the decision of the Defendant

Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Arnold was born on December 19, 1962. She graduated from high

school. She last worked in September 2013. Arnold suffers from diabetes

mellitus, asthma, chronic intermittent diarrhea, degenerative disc disease

status post spinal surgery, lumbar scoliosis, osteoarthritis, obesity,

depression, personality disorder, and anxiety disorder. R. 18, 20-21, 106,

967, 1006. Arnold filed for her applications for Disability Benefits on

December 27 and 30, 2013. She alleged that she became disabled on

December 26, 2013.[1]

On June 14, 2013, Arnold went to Transitions of Western Illinois

(Transitions) for a mental health assessment. R. 580-92. The record

indicates that she went to Transitions because she had been convicted of a

felony and was required to do so as a mandatory condition of a 24-month

term of probation. R. 629. At that time, Arnold had a depressed affect with

feelings of worthlessness. Arnold's speech and concentration were normal,

and her thought process was circumstantial. R. 588. Arnold was

---

[1] Arnold previously applied for Disability Benefits on September 9, 2008. She alleged she became disabled on May 30, 3008. An evidentiary hearing was held on July 29, 2010. R. 39-101. On January 12, 2011, an Administrative Law Judge determined that she was not disabled. R. 148-57. The record does not indicate the outcome of any appeals.

diagnosed with major depressive disorder and personality disorder not otherwise specified.[2]  R. 589-90.  Thereafter, Arnold received regular mental health counseling and treatment at Transitions through at least the spring of 2016.  See R. 571-625, 676-722, 1127-65.

On August 27, 2013, Arnold had an MRI of her left knee and x-rays of both knees.  She reported constant pain in her knees.  She said she rolled her knee three years earlier. The MRI showed advanced tricompartment osteoarthritis with deep cartilage loss, subchondral bone changes and multiple osteochondral loose bodies; and knee joint effusion and synovitis.  R. R. 530.  The x-rays showed osteoarthritis in both knees, with the left greater than the right, and bilateral joint effusions, greater in the left than the right.  R. 531.

On September 13, 2013, Arnold saw her counselor at Transitions.  R. 608-11.  Arnold was doing well, stable, and had no complaints.  R. 608. Her mental status examination was normal.  The counselor found that her

---

[2] Arnold was assigned a Global Assessment of Functioning (GAF) score of 49. A GAF score is an assessment of the overall level of functioning of an individual.  A GAF score of 41 to 50 indicates serious symptoms or serious functional limitations.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV-TR), at 34.  The American Psychiatric Association no longer recommends the use of GAF scores.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.  The ALJ did gave little weight to GAF scores in her decision.  R. 29.  Arnold does not challenge this aspect of the ALJ's decision.  The Court, therefore, will not otherwise include GAF scores in this Statement of Facts.

major depressive disorder and personality disorder were stable.  R. 609.
The counselor said to continue current medications.  R. 610.

On September 26, 2013, Arnold went to the Community Outreach Clinic operated by Blessing Hospital in Quincy, Illinois.  She saw nurse practitioner Julie Barry, CNP.  Arnold went to the clinic for a preoperative clearance check before left knee arthroscopy with debridement.  Arnold weighed 232 pounds.  She was alert and oriented.  She had no joint edema, full range of motion in all extremities.  She reported discomfort in her right shoulder with full range of motion.  She had equal strength in all extremities.  R. 550.

On November 15, 2013, Dr. George Crickard III, M.D., performed a left knee arthroscopy with partial medical meniscectomy to treat a left medial meniscal tear.  Dr. Crickard performed the surgery on an outpatient basis.  Dr. Crickard noted that "no untoward findings were seen: during the surgery," but also noted that the knee had other arthritic changes that existed in the knee.  R. 520.

On December 11, 2013, Arnold saw nurse practitioner Barry for one-month follow-up after left knee arthroscopy.  R. 554.  Arnold reported that her knee was better after the surgery.  Arnold said "there was still a pop in it at times."  Arnold reported increased pain and decreased range of motion

in her right shoulder. She said she had less edema in her ankles. She stated that she had some pain and cramping in her back. On examination, Arnold had pain with range of motion in her right shoulder, but no pain on palpation. Arnold was post-operative physical therapy for her left knee. Barry added therapy for her shoulder to the therapy order. R. 554.

On December 19 2013, Arnold saw her counselor at Transitions. R. 604-07. Arnold was doing well, stable, and had no complaints. R. 604. Her mental status examination was normal. The counselor found that her major depressive disorder and personality disorder were stable. R. 605. The counselor said to continue current medications. R. 606.

On January 6, 2014, Arnold saw a physical therapist for her joint pain in her shoulder and left knee. R. 1656-58. Arnold told the therapist that she was doing better until she got sore from delivering newspapers. The therapist noted, "Disposition: was doing well until started walking through snow delivering papers." R. 1656. The therapist noted that Arnold generally had strength in her shoulders and lower extremities ranging from -4/5 to 4/5. R. 1656-57.

On January 14, 2014, Arnold saw a physical therapist. R. 1666-68. Arnold rated her shoulder pain at 7 out of 10, and her knee pain at 5 out of 10. Arnold said that climbing stairs "0-10 minutes" and walking "0-10

minutes" were factors that aggravated her pain. Arnold said that she was "Doing well today" and was "sore from walking a lot yesterday." R. 1666. On examination, Arnold had an abnormal, stiff knee gait, moderate. Her left knee was "hypermobile." Her lower bilateral extremity muscle strength was 4/5 in except for -4/5 in her knee extensions. R. 1666-67. The therapist guided Arnold through a set of exercises. Arnold tolerated the therapy with minimal complaints of pain and difficulty. R. 1668.

On January 28, 2014, Arnold saw physician's assistant Steven Dement, P.A., for a corticosteroid injection in her knee. Arnold reported she had aching in her knee, but was still participating in physical therapy and performing her exercise program. She rated the pain in her knee at 7 out of 10 and said the pain was intermittent. Dement gave her the injection. R. 476-77.

On February 6, 2014, Arnold went to Blessing Hospital emergency room. She reported that two days earlier she slipped and fell on ice while delivering newspapers. Since then, she had nausea and lower back pain. She said her pain was moderate. R. 518. X-rays of her lumbar spine showed spondylolisthesis at L4 on L5 without obvious spondylotic defect, moderate progressive degenerative narrowing at that level; mild narrowing at L5-S1 that was stable, and marginal osteophytic spurring at the L1-2

level that was stable.  There were also stable degenerative changes in the sacroiliac joints.  R. 538.  A head CT scan showed no acute intracranial abnormality and no evidence of a skull fracture.  R. 539.  Arnold's condition improved and she was released from the emergency room.  R. 519.

In February 2014, Arnold completed a Function Report—Adult form. R. 366-73.  Arnold stated that she could not work because she had problems standing, sitting, and walking; she could not lift more than 10 pounds; she had problems gripping with her right hand; she had a short attention span; and "sometimes my other personality comeout (sic)."  R. 366.  Arnold said that in a typical day, she got up, dressed, ate breakfast, talked to her mother, and ate lunch. She said after lunch she spent time with a friend two to three times a week or else she took short walks or read. She made supper and watched television in the evening.  R. 367.

Arnold said she slept four to five hours a night.  She said her pain interfered with her sleep.  Arnold said she made all her meals from scratch because she was allergic to chemicals in prepared foods.  She stated that she took two to three hours to cook each day, with breaks.  Cooking took longer, according to Arnold, because of her limited ability to stand.  Arnold did dusting, vacuuming, and dishes.  She said she pulled weeds in her yard.  She said she sometimes needed encouragement to do these tasks

"sometime when my body is really hurting or to remember to do it." R. 368. She said she did not do some housework and yardwork because she had trouble bending due to pain.

Arnold stated that she went outside every day except when she was sick or the weather was bad. She did not drive because she did not have a driver's license. She took public transportation. She shopped for medicine and shopped for groceries two to three times a month. R. 369. She regularly went to church. R. 370.

Arnold said she read books and magazines daily, watched television daily, and worked puzzles when she could find one. She had problems sitting still which made it hard to concentrate and did not go out "as much as she should" due to her impairments. R. 269-70.

Arnold said that she could lift 10 pounds and walk three blocks. She said her back became tight after standing for 20 minutes. She could not squat, and she hurt when bending or kneeling. She also said she had weakness in her right hand. R. 371. Arnold said she could follow written and spoken instructions, and authority figures made her nervous but she got along with them. She said she took walks to handle stress and used a cane when her knees bothered her. R. 372.

On February 27, 2014, Arnold saw her physical therapist for her left shoulder and left knee.  R. 1697-99.  Arnold rated her pain currently at 8/10 with activity.  Arnold said that currently her right side was sorer than the left.  She said she "[h]ad been on her feet all morning."  On examination, her lower extremities bilaterally had mild restrictions on flexibility and muscle strength that ranged from +3/5 to 5/5 depending on the motion. Arnold's knee extensions were +4/5 and her knee flexions were 5/5 on the left and +4/5 on the right. R. 1697.  Arnold tolerated the therapy session with minimal complaints of pain and difficulty.  R. 1698.

On March 13, 2014, Arnold saw state agency psychologist Dr. Frank Froman, Ed.D., for a mental status examination.  R. 627-33.  Dr. Froman had examined Arnold before.  R. 627.  Dr. Froman assessed chronic mild major depressive disorder; and mixed personality disorder with borderline, inadequate, dependent and antisocial traits. Dr. Froman opined that Arnold "appears able to perform simple one or two step assemblies at a competitive rate, as long as she is able to sit down.  She feels that her walking is limited to no more than three blocks before she 'crashes.'" Dr. Froman opined that Arnold could relate "modestly, but accurately" to others; and understand oral and written instructions.  Dr. Froman stated,

"As long as the job would not be too stressful for her, I believe that she would be able to function competitively." R. 630.

Dr. Froman noted that Arnold told him that she had been convicted of a felony, and that she had been fired from her last job because of the felony. Arnold told Dr. Froman that she was serving a 24-month term of probation with mandatory counseling at Transitions. R. 629.

On March 18, 2014, Arnold saw her counselor at Transitions. R596- Arnold was doing well, was stable, with no complaints. R. 596-99. Her mental status examination was normal. The counselor found that her major depressive disorder and personality disorders were stable. R. 597. The counselor said to continue current medications. R. 598.

On April 19, 2014, Arnold saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination. R. 636-42. Arnold said that she had arthritis all over. She had pain from scoliosis in her spine. She said she had injections in her low back, but they did not work to relieve the pain. She said that physical therapy did not work and her pain medication did not work. She indicated that she did not use a cane or walker. Arnold stated that she could walk three blocks and lift 10-15 pounds. Arnold stated that she currently helped deliver newspapers. R. 636.

On examination, Arnold was 66 1/8 inches tall and weighed 226 pounds. She was alert and oriented. Her memory was intact and her fund of knowledge was normal. Arnold walked with a mild limp. She could walk 50 feet unassisted. She could tandem, heel, and toe walk. She could squat ½ way down and had difficulties hopping on her right leg. Arnold had decreased range of motion in her knees, cervical spine, and lumbar spine. Arnold had no muscle atrophy. Arnold's pinch, arm, and grip strength was 5/5. Her leg strength was 4+/5. Arnold had no difficulty getting on and off the examination table. She had no edema in her lower extremities. R. 638. Dr. Leung's impression was arthritis and minimal scoliosis with decreased range of motion in her spine and knees. R. 639.

April 24, 2014, Arnold saw Dr. Maria Espijo, M.D., for a follow up. R. 644-47. Dr. Espijo gave Arnold a transforaminal epidural steroid injection at L4-L5 in her lumbar spine in March 2014. R. 1019-20. Arnold saw Dr. Espijo early for her follow up because Arnold complained of persistent weakness in her lower extremities. Dr. Espijo noted, however, "It is interesting, however, that she walked 8 blocks to come to the clinic today." R. 645. Arnold reported that she had no pain immediately after the injection, but the pain began to return the next day. Arnold did not report any numbness. She said that she had more pain and weakness. R. 645.

On examination, Arnold had a slightly antalgic gait with complaints of knee pain. The muscles in the lower extremities were normal except for slight pain inhibited weakness due to knee pain. Arnold's sensory nerves were normal. Dr. Espijo increased Arnold's muscle relaxants. Dr. Espijo stated that Arnold's lower extremity weakness was not radicular, but came from her pain. Dr. Espijo recommended a referral to a spine surgeon. Arnold said her primary healthcare provider was looking for a surgeon for her left knee. R. 64.

On May 13, 2014, state agency psychologist Dr. Linda Lanier, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. R. 167-69; 172-74. Dr. Lanier found that Arnold suffered from affective disorders (depression) and personality disorders. Dr. Lanier opined that, due to her mental impairments, Arnold had mild restrictions on activities of daily living and moderate difficulties in maintaining concentration, persistence or pace; but no difficulties in social functioning and no episodes of decompensation. R. 168. Dr. Lanier opined that Arnold was moderately limited in her ability to complete a normal workday and workweek without interruption, or to perform at a consistent pace. Dr. Lanier opined that Arnold's ability to maintain sustained concentration may be affected by depression. Dr. Lanier said

that Arnold was moderately limited in her ability to interact with the public, and moderately limited in her ability to accept instructions and criticism from supervisors, and in her ability to get along with coworkers. Dr. Lanier explained that Arnold had a lowered social tolerance due to her mental impairments. R. 172-73.

Dr. Lanier concluded:

[Claimant] has the cognitive ability to remember general work procedures, and retains the capacity to understand and remember moderately complex instructions.

She has attention and concentration necessary to persevere at and complete those operations for time periods usually expected in the work force. She retains the capacity to maintain a schedule and be on time. She would need only common supervision. She has the pace and endurance necessary to fulfill a normal workday and week on a consistent basis, to perform at a consistent acceptable rate, and would require only common numbers and lengths of rest breaks.

She has lowered social tolerance due to depression and personality disorder but can relate appropriately in socially undemanding settings with low stress demands that require only brief superficial interactions and with reduced interpersonal contact away from the general public.

She retains the capacity to adapt to simple changes in daily routines, and the capacity to be aware of and self -protective of common hazards. She retains the capacity to utilize public transportation to and from a place of work.

R. 173.

On May 20, 2014, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Function Assessment of Arnold. R. 170-72. Dr. Smith opined that Arnold could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; and frequently climb ramps or stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, and scaffolds. Dr. Smith also said that Arnold should avoid concentrated exposure to extreme cold, heat, humidity, fumes, dusts, odors, gases, and poor ventilation. R. 170-71.

On July 23, 2014, Arnold saw orthopedic nurse practitioner Nicollette Haubrich, ANP, FNP-BC for bilateral knee pain. R. 739-42. Arnold said she had the pain for three to four years. She said she fell when she stepped on some acorns. Arnold said the pain was a "constant achy pain with muscle spasm in the left leg only." Arnold indicated she had catching in her left knee a couple of times a day. Arnold said standing, walking, twisting, squatting, going up and down stairs, and sometimes sitting aggravated her pain. Arnold said that physical therapy did not work and an injection in the left knee did not work to relieve the pain. Arnold said that she walked with a cane since the springtime in 2014. R. 740.

On examination, Arnold's knees were tender to palpation; the alignment of the patella in the left knee was lateral; the quadriceps and hamstring muscles had 5/5 strength bilaterally; the left knee was positive for valgus stress; and both knees were positive for varus stress and patella SLR with knee flexion/extension crepitus. R. 741-42. Haubrich diagnosed bilateral knee pain, greater on left; moderate right and severe left tricompartmental osteoarthritis; overweight; and borderline diabetic. Haubrich prescribed a knee brace and recommended alternating heat and ice on the affected area, to continue home exercises, and to continue her medication. Arnold wanted to consider a steroid injection in the right knee. R. 742.

On September 22, 2014, Arnold saw orthopedic surgeon Dr. Khaled J. Saleh, M.D., F.A.C.S., for bilateral knee pain. R. 735-36. Arnold said the left knee bothered her the most. She said she had pain in her left knee when she walked and when she went up and down stairs. She had difficulty squatting. Dr. Saleh noted, "She had difficulty walking for her job, which is helping someone with their paper route." R. 735. On examination, Arnold was 67 inches tall, weighed 233.6 pounds, and had a body mass index (BMI) of 36.66. R. 736. Arnold's left knee had significant opening of the medial compartment on valgus stress; significant decrease in range of

motion; and her patella crepitus was sometimes painful.  Dr. Saleh

assessed bilateral knee arthritis, left greater than right.  Dr. Saleh

discussed a total knee replacement, but said that she needed to lose 20

pounds and get her blood sugar under control first. R. 736.

On November 4, 2014, surgeon Dr. Nitin Kukkar, M.D., performed a

transforaminal lumbar interbody fusion surgery at L4-L5 of Arnold's lumbar

spine.  R. 1031-40.  On December 18, 2014, Arnold saw Dr. Kukkar for a

follow up.  R. 723-24.  Arnold said that she was doing very well.  Her back

pain was zero 0 out of 10.  She said she had some pain in her left leg and

some "very occasional," "very mild" spasms.  She said she was "very, very

happy with the surgery."  Dr. Kukkar said that her neurological examination

on November 4 was "excellent" and she had 5/5 strength in all muscles.  R.

724.

On December 16, 2014, state agency psychologist Dr. Tyrone

Hollerauer, Psy.D., prepared a Psychiatric Review Technique and Mental

Residual Functional Capacity Assessment.  R. 199-201, 206-08.  Dr.

Hollerauer said that, due to her mental impairments, Arnold had mild

restrictions on activities of daily living and moderate difficulties in

maintaining social functioning, but, had no difficulties in maintaining

concentration, persistence or pace, and had no episodes of

decompensation.  R. 199.  Dr. Hollerauer opined that Arnold was moderately limited in her ability to complete a normal workday and workweek.  Dr. Hollerauer explained that her depression may affect her ability to maintain sustained concentration.  Dr. Hollerauer found that Arnold was moderately limited in interacting with the public and getting along with coworkers.  R. 208.  Dr. Hollerauer restated verbatim Dr. Lanier's concluding opinions quoted above.  R. 208.

On December 17, 2014, state agency physician Dr. Charles Wabner, M.D., prepared two Physical Residual Functional Capacity Assessments, one Assessment as of the last date that Arnold qualified to receive DIB benefits September 30, 2014 (Date Last Insured); and a current Assessment.  R. 202-06; see R. 20. Dr. Wabner opined that, as of Arnold's Date Last Insured, she could occasionally lift 20 pounds and frequently lift 10 pounds; sit and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to extreme heat and cold, fumes, odors, dusts, gases, poor ventilation, and hazards from machinery or heights.  R. 202-04.  Dr. Wabner opined in his current assessment that, as of September 30, 2014, Arnold's residual functional capacity changed from

the Date Last Insured only in that she could now only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. R. 205-06. Dr. Wabner did not indicate in his current assessment whether Arnold should avoid extreme heat and cold, fumes, odors, dusts, gases, poor ventilation, and hazards from machinery or heights.

On December 12, 2014, Arnold saw her counselor at Transitions. R. 676-79. Arnold stated that she was doing all right. Her mental status examination was normal. R. 677. Arnold denied any symptoms of depression. She said she was sleeping well. R. 1162.

On December 19, 2014, Arnold saw Dr. Kukkar for a follow up examination. R. 723-24. Arnold reported that she was doing "very, very well." She rated her pain at 0 out of 10. She said that she some "very occasional" and "very mild" spasms and pain in her left leg. Arnold said she was very happy with the surgery. X-rays showed the hardware to be in good position. R. 723. Arnold's neurological examination was "excellent" and she had 5/5 strength in all muscles.

On December 19, 2014, Arnold also saw her counselor at Transitions. R. 680-83. Arnold said that she was having some issues with her knee, but was doing well. The counselor noted that she was stable. R. 680. Arnold's mental status examination was normal and her major

depressive disorder was stable.  The counselor recommended continuing her current medications.  R. 683.

On February 3, 2015, Arnold saw her counselor at Transitions.  R. 1158-61.  She said she was doing well.  R. 1158.  Her mental status examination was normal. R. 1159.  The counselor recommended continuing her medications.  R. 1160.

On March 31, 2015, Arnold saw nurse practitioner Barry.  Arnold described her health as good.  Arnold reported that she walked for exercise.  Arnold reported pain in her knees.  She wore a brace on her right knee.  Arnold said she was trying to diet to lose weight.  She said she had gassiness and diarrhea several times a week.  She said she had no pain, but mild cramping and loose stools.  Arnolds said that dicyclomine helped with the diarrhea and gassiness.  Arnold said that she had joint pain, but no joint swelling, no stiffness, no back pain, and no muscle weakness.  Arnold reported she had no headaches, no numbness, and no tingling.  Arnold said she had no feelings of depression and was not feeling anxious.  R. 1006. On examination, Arnold's abdomen had normal bowel sound, and was soft and non-tender.  Arnold has a normal gait, normal movement and full range of motion in all extremities, and normal muscle strength and tone.

Barry noted crepitus in the left knee.  Arnold's spine was normal.  Arnold's mood and affect were normal.  R. 1009.

On April 2, 2015, Arnold saw Dr. Kukkar.  R. 921-23.  Dr. Kukkar said that Arnold was doing very well and was back at work full time.  Arnold reported that two weeks before this office visit, she picked up 80 pounds on her back.  Arnold started feeling back pain, but the pain was getting better.  On examination, Arnold's neurological examination was normal and an x-ray showed that her surgical hardware was in good position.  R. 921.

On May 1, 2015, Arnold saw her counselor at Transitions.  Arnold told the counselor that she was fully recovered from her back surgery.  Arnold said she would like to work.  R. 1184.

On June 4, 2015, Arnold went back to see Dr. Kukkar.  Arnold reported that she continued to have back pain, but not as bad as before the surgery.  The pain was always in her back, and the pain worsened with activity.  A CT scan showed some failure of the surgical fusion with pseudarthrosis and a break-up of the interbody.  Dr. Kukkar recommended a second surgery to repeat the spinal fusion.  Arnold agreed to the second surgery.  R. 853-54.

On June 10, 2015, Arnold saw nurse practitioner Barry.  Arnold reported that she walked for exercise.  Arnold said she had constant

diarrhea.  Arnold said she did not like taking dicyclomine.  Arnold told Barry "stools are less when she takes them but doesn't remember to take them."  R. 994.  On examination, Arnold's abdomen had normal bowel sounds and was soft and non-tender.  Arnold had normal gait, no joint swelling, and normal movement in all extremities, normal muscle strength and tone.  Arnold's mood and affect were normal.  R. 997.

On July 7, 2015, Dr. Kukkar performed a repeat fusion surgery on Arnold at L4-L5.  R. 1054-59.  On July 23, 2015, Arnold saw Dr. Kukkar for a follow up.  Arnold was doing well. She had some pain on the right side and buttock.  Dr. Kukkar removed the stitches.  X-rays showed the hardware was in excellent position.  Neurologic examination was normal with 5/5 strength in all muscles.  R. 846.

On July 21, 2015, Arnold saw a counselor from Transitions.  Arnold said she was feeling more depressed.  She said she had been "getting out to walk and enjoys doing that."  Arnold was in a positive mood.  The counselor said she was able to cope with her symptoms by walking.  R. 1201.

On August 4, 2015, Arnold saw her counselor at Transitions.  R. 1150-53. She said she was doing well.  R. 1150.  Her mental status examination was normal.  The counselor adjusted Arnold's diagnosis to

depression and anxiety, and removed the diagnosis of major depressive disorder.  R. 1152.

On August 7, 2015, Arnold saw Dr. Ochuele Odumosu to establish a primary care relationship with him.  Arnold reviewed her history concerning her conditions including her surgeries.  Arnold also reported chronic abdominal pains with diarrhea "on and off."  Dr. Odumosu said Arnold was scheduled for a gastrointestinal (GI) evaluation on August 31, 2015.

On examination, Dr. Odumosu observed that Arnold's abdomen had normal bowel sounds, was soft, non-tender, and had no hepato-splenomegaly.  Arnold had no joint swelling, normal movement in all extremities, no joint instability, and normal muscle strength and tone.  Arnold said she used a cane to walk long distances.  Arnold's mood and affect were normal.  R. 983-84.

On August 17, 2015, Arnold saw her counselor at Transitions.  Arnold said she had been cleaning her church as part of her community service and helping her friend with a paper route.  Arnold said, though, that she did not want to get out of bed somedays.  Her counselor encouraged her "to get up and get moving to help improve her motivation."  R. 1208.

On August 20, 2015, Arnold saw Dr. Kukkar for a follow up.  Arnold reported that she was doing very well except for some right flank pain.  She

reported her pain to be mostly at a 2 out of 10 level. She also had occasional spasms with pain at 8 out of 10. She had 5/5 strength in all of the muscles in her lower extremities. She walked without support, but still wore a brace. X-rays showed that the hardware was in excellent position. R. 839.

August 31, 2015, Arnold saw gastroenterologist Dr. Daniel Moore, M.D., for a GI evaluation. Dr. Moore noted Arnold's history of diarrhea. Dr. Moore noted that dicyclomine reduced the number of bowel movements and firmed up the bowel movement. Dr. Moore noted that nurse practitioner Barry noted that Arnold did not like taking dicyclomine and forgot to take it. R. 967. Arnold told Dr. Moore that she had chronic intermittent diarrhea for over a year. Arnold kept a food diary for the last three months. The diary showed diarrhea every four to five days. Arnold confirmed that dicyclomine helped, but she did not like taking it. She said she tried over-the-counter probiotics which made the diarrhea worse. R. 967. On examination, Arnold had normal bowel sounds, her abdomen was soft and non-tender, with no hepato-splenomegaly, no abdominal mass palpated, and no hernia discovered. Dr. Moore assessed diarrhea and recommended eating more fiber and to continue the dicyclomine. Dr.

Moore also suggested a more detailed review of her diet to identify possible causes for the diarrhea.  R. 970-71.

On September 4 and 15, 2015, Arnold saw her counselor at Transitions.  Arnold stated that she had improved her motivation to complete tasks.  Arnold stated that she had been working with a friend on the friend's paper route.  R. 1212-13.

On September 29, 2015, Arnold had an x-ray of her lumbar spine. The x-ray showed post-surgical changes with mild degenerative changes of the lumbar spine without evidence of an acute fracture.  R. 1113.

On October 1, 2015, Arnold saw Dr. Kukkar for a follow up.  R. 817-19.  Arnold said she had some intermittent mild back pain.  She described the pain as dull and did not radiate.  On examination, Arnold's gait and station were normal.  She had normal strength and tone bilaterally, and her sensory function was normal.  R. 817.

On October 26, 2015, Arnold saw her counselor at Transitions. Arnold reported that she had not felt depressed lately.  Arnold said that helping at her church and going for walks helped her keep from getting depressed.  R. 1224.

On November 10, 2015, Arnold saw a nurse at Transitions for medication monitoring.  Arnold denied any symptoms of depression.  She

said that her mood was good and stable.  Arnold said that she was not having any problems sleeping; in fact, Arnold stated that she was "sleeping much more than she should be."  R. 1230.  Her mental status examination was normal.  R. 1147.

On November 12, 2015, Arnold saw Dr. Kukkar for a follow up.  R. 809-12.  Arnold stated that a month earlier she started having moderate mid back pain.  At the visit, her pain level was a 1 out of 10.  R. 809.  On examination, Arnold's joints, bones, and muscles appeared normal with normal strength and range of motion.  Dr. Kukkar administered trigger point injections around the left scapular border.  R. 811.

On December 1, 2015, Arnold saw Dr. Odumosu for increased right knee pain.  R. 942-46.  Arnold said she had pain in both knees, but the right was worse than the left.  Arnold reported swelling in her right knee for three weeks and pain for a week and a half.  Arnold rated the pain as 8 out of 10.  Arnold said she previously used a knee brace, but could not currently because of the swelling.  R. 942. Arnold said she used a cane to walk long distances.  R. 945.  On examination, Dr. Odumosu found no joint swelling, normal movement in all extremities, no joint instability, and normal muscle strength and tone.  R. 945.  Dr. Odumosu referred Arnold back to the orthopedic surgeon.  R. 945.

On December 10, 2015, Arnold saw nurse practitioner Haubrich for her right knee pain.  Arnold reported knee spasms and pain for two weeks before the appointment.  Arnold said her knee pain was 7 out of 10.  Arnold ambulated with a cane.  She said knee spasms and pain were waking her up at night.  She said the brace Haubrich prescribed in October 2014 did not fit any more because of swelling.  Arnold asked for a new brace. Arnold said both knees popped and cracked.  She said that she felt unstable walking; she felt like her knees may give out on her.  R. 795.  On examination, Arnold had an antalgic gait.  Arnold had painful, restricted range of motion in her right knee.  Arnold's strength was 5/5 bilaterally in her quadriceps and hamstrings.  X-rays taken December 1, 2015, showed tricompartmental joint space narrowing, marginal spurring, and small joint effusion; but, no fracture or dislocation.  Haubrich diagnosed tricompartment osteoarthritis of the knee.  Haubrich recommended weight loss to reduce discomfort, increase range of motion and strength, and provide a better outcome of any possible surgery.  Haubrich indicated that she would seek a surgeon who would perform a knee replacement. Haubrich prescribed alternating heat and ice, physical therapy, and exercise.  R. 797.

In December 2015, Arnold participated in regular physical therapy. Several times during these sessions, Arnold reported significant walking. On December 15, 2015, Arnold told her therapist that her hip was sore because she had "walked too much this weekend." R. 1738. On December 22, 2015, Arnold stated that her right hip was hurting, but Arnold "did a lot of walking today." R. 1741. On December 28, 2015, Arnold stated that both hips were sore, "but has been doing a lot of walking today." R. 1746.

On January 22, 2016, Arnold saw Dr. Odumosu for acid reflux and high cholesterol. R. 93640. Arnold said she was having pain in her right shin and had been getting more headaches. Dr. Odumosu noted that Arnold was wearing a right knee brace. Arnold said that the shin pain was unrelated to the knee brace. Dr. Odumosu noted that he was prescribing pain medication for the knee pain. Dr. Odumosu said that Arnold's migraine headaches were well controlled with medication. R. 936. On examination, Arnold had no joint swelling, no joint instability, normal strength and muscle tone, and normal movement in all extremities. Arnold used a cane to walk long distances. She walked with a limp. Arnold's spine was normal. R. 939.

On February 2, 2016, Arnold saw Dr. Kukkar for a follow up on Arnold's back surgery. Arnold's pain was 0 out of 10. She only complained of knee pain. X-rays showed a stable L4-L5 fusion with minimal retrolisthesis L1 on L2. Dr. Kukkar discharged Arnold from his care. R. 805, 1116.

In winter and spring of 2016, Arnold reported to her counselor at Transitions that she walked to reduce her anxiety. On February 22, 2016, Arnold told her counselor that she had been going for long walks since the weather had been good. She stated that going for walks reduced her anxiety. R. 1251. Her mental status examination on February 22, 2016 was normal. R. 1143. On March 17, 2016, Arnold told her counselor that she used music and walking exercises to decrease her stress. R. 1257. On March 21, 2016, and April 5, 2016, Arnold stated that walking and meditation helped her manage her anxiety. R. 1258, 1260.

## THE ADMINISTRATIVE HEARING

On July 28, 2016, an Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 102-44. Arnold appeared with her attorney. Vocational expert Michelle Peters-Pagella appeared by telephone. R. 104.

Arnold testified first. Arnold said she graduated from high school. She lived with her mother. R. 106, 112. She last worked in 2011 as an

independent contractor delivering newspapers for the Quincy Herald Whig newspaper. R. 106. Before that, she worked as an aid in a healthcare facility called Addus Healthcare. She provided care to elderly and disabled residents. R. 107. Previously, she worked in a kitchen in a care facility. She washed dishes and helped "get things ready for the next meal." R. 108. Prior to that she worked as a sales representative and for a facility that assembled car parts. R. 108-09.

Arnold said she was not working because, "Between my, my back and my feet and my legs, I have problems standing any long period of time." R. 110.

The ALJ asked Arnold if she left Addus Healthcare for health reasons or other reasons. Arnold said she left for other reasons. Arnold said she was let go from the company. "They said I had stole some stuff from a lady which she had given me consent to take home and mend some stuff and bring it back." The ALJ asked if that event resulted in any criminal charges. Arnold said no, only discharge from work. R. 110.

The ALJ asked about references in the file about some legal charges. Arnold's attorney said that she had been in legal trouble before. Arnold stated that she had gone to jail in Quincy, Illinois, in August of 2014.

Arnold said she was there about 30 days.  She said "somebody said I stole a purse out of a car."  R. 137.

Arnold said she has been looking for work since she stopped delivering newspapers.  R. 110.  She looked for kitchen work, but was not sure she could do the work.  R. 111.

Arnold indicated she was 5 feet 7 inches tall and weighed 239 pounds.  R. 112.   She could lift 10 pounds on a regular basis.  R.111.  She later indicated that the most weight she could lift was 10 pounds.  R. 135.  She stated she went up and down stairs at home one step at a time.  R. 111.  She  could not bend, squat, and stoop without pain.  R. 136.

Arnold said she had two surgeries on her back.  She testified she had pain in her back when she walked.  R. 113-14.  Her back seized up and she still had back pain after her surgery.  She said her back still seized up occasionally.  She explained that when her back seized, "It just tightens up into a ball."  R. 114.   The pain was in the middle of her back, but did not radiate.  R. 114-15.  Arnold said her back felt better sometimes when she sat or stood.  She said she changed positions one to two times an hour.  She did not lie down because of her back pain.  R. 115.

Arnold testified that she had pain in her right hip when she walked and stood.  She said the pain was "a stabbing and burning sensation."

Arnold said her left knee needed to be replaced. She had a knee brace from Haubrich (transcribed phonetically as Holbrook). R. 116. Arnold said she had to lose weight before she can have the knee replacement. Arnold said her left knee was not "real stable" when she stood. She could stand about two to three hours before her left knee started to hurt. Arnold said she had a brace on her right knee to keep it from going out, but the knee still hurt. R. 117.

Arnold said that her knee started hurting after she stood for 10 to 15 minutes. She acknowledged that she just said she could stand for two to three hours. She said her pain depended on what she was doing. She said that she could just stand for 45 minutes to an hour before her knees would start to hurt. R. 117-19.

Arnold said she had swelling in her knees and ankles. Once or twice a week, she elevated her legs in the evening for an hour. R. 120-21. Arnold indicated she had been elevating her legs for five to 10 years. R. 121. She had arthritis pain in her ankles and had physical therapy for the pain. R. 121.

Arnold testified about her treatment at Transitions. Arnold said she had anxiety. She had crying spells four to five times a month. She stopped eating when she had anxiety attacks. Arnold said she also had panic

attacks. Arnold could not remember what happened during a panic attack except she got "real stressed out and I don't eat." R. 122. She also did not want to do anything when she had a panic attack. She said she had panic attacks two to three times per month. R. 123.

Arnold said she had problems with severe diarrhea. She had diarrhea four to five times a month. The diarrhea lasted up to three days at a time. She went to the bathroom twice an hour when she had diarrhea. Each trip lasted 10 to 15 minutes. She said that she also had cramps and sudden urges to go. Arnold said she had accidents five times in the last month when she failed to get to the bathroom in time. She said the problem had been severe for a year. R. 125-26.

Arnold said she had pain in her shoulder and arms. She said, "I get shooting pains and a couple of bone chips in [her elbow], so they hit the nerve wrong and I can lose feeling. It's all the way up to my hand." R. 128. She said that throwing newspapers caused the bone chips. R. 128.

Arnold said she had arthritis in her hands. She said she could type "somewhat." She could hunt and peck. She said her fingers got stiff and sore. She could use her hands about four or five hours before they became stiff and sore. She said she had no feelings in the fingertips of her right dominant hand. R. 128-19. She had difficulties picking up small

objects on the floor.  She said, "I either have to jam my fingernail on the floor to do it or literally watch myself pick it up."  R. 129.

Arnold said that her medicines made her dizzy about two to three times a week.  The dizzy spells lasted 30 minutes.  She had to sit down during the spells.  R. 130.

Arnold said she did her own grocery shopping.  She rode the bus to the store, and a friend picked her up and drove her home after she finished. Arnold said she had problems reaching items on the shelves if her back was hurting.  She walked around the store for an hour shopping.  She held onto the grocery cart for support.  She sat down at the grocery store and took two to three breaks while shopping.  R. 133.

Arnold said that during a typical day, she helped her mom out with whatever her mom needed.  She sometimes did yard work.  She said that she pulled weeds for about two hours at time, then she had to get up.  She had problems getting on her knees to scrub floors.  During an eight-hour day, she sat about half the time during the day and stood the rest.  During that time, she usually changed positions three to four times.  She did not lie down during the day.  R. 134-35.  She had no problems dressing herself. After her first back surgery, she used a shower chair to take a shower.  R. 134.

Arnold testified that she stopped driving because she had trouble concentrating. She said she did not renew her license because she could not drive. She indicated she did not have trouble concentrating while reading or watching a television show. R. 131. Arnold later testified that she told Social Security evaluators that her license was suspended because she accumulated too many points. She admitted to the evaluators that she had a "lead foot." R. 137-38. Arnold said that she was eligible to have her license reinstated. R. 138.

Vocational expert Peters-Pagella then testified. The ALJ asked Peters-Pagella the following hypothetical question:

> [I] have some hypotheticals for you. The first one asks you to assume a hypothetical individual of the Claimant 's age, education and work history, with the residual functioning capacity that allows the individual to work at a light exertional level, but with certain limitations. Give me just a moment here to check something else.
>
> All right. The limitations would include never being exposed to unprotected heights or hazardous work environments, never climbing ladders, ropes or scaffolds, frequently balance, occasionally climb stairs or ramps, occasionally stoop, kneel or crouch, but never crawl. Engage in frequent handling, but only occasional fingering and I would define fingering as manipulating small objects approximately the size of a paperclip.
> . . . .
> Limited to remembering and carrying out simple, routine tasks and making simple work related decisions. We would avoid production paced tasks. Could have frequent contact with supervisors and coworkers and occasional contact with the general public, who would need to limit concentrated exposure

to dusts, fumes and pulmonary irritants to only occasional
basis. And finally, the hypothetical individual would be off task
ten percent of the workday. Should I repeat any of those?

R. 140. Peters-Pagella opined that such a person could not perform

Arnold's past work, but could perform other jobs that exist in the national

economy. Peters-Pagella testified that such a person could perform jobs

such as sorter, with 180,000 such jobs in the national economy; hand

packaging positions, with 150,000 such jobs in the national economy; and

inspection jobs, with 165,000 such jobs in the national economy. R. 141.

Peters-Pagella said that the person could not work if she was off task

20 percent of the time during the workday. R. 141. Peters-Pagella opined

that the person could not work if handling was reduced to occasional

instead of frequent. Peters-Pagella said that the person would be limited to

sedentary work if she was limited to four hours of sitting and four hours of

standing in a workday. Peters-Pagella said that the person could be absent

a maximum of two days a month. R. 142.

At the end of the hearing the ALJ and Arnold's attorney had the

following colloquy:

ATTY: Well, I, I would just say -- we want to be careful about
the skills that transfer from prosecuting Attorney to
administrative law, Judge. So we got a little more into some of
the criminal stuff than I typically had in a Social Security
hearing. So –

ALJ:  Well –

ATTY:  And with the –

ALJ:  I felt it was appropriate.

ATTY:  No, I know.  But with the new SSR, the credibility determinations are supposed to be kind of removed from the process.

ALJ:  I believe my questions pertained to consistency.

ATTY:  Yeah, I'm –

ALJ:  Yeah.

ATTY:  I just -- trying to --

ALJ:  Okay.

ATTY:  -- do my job.

ALJ:  Anything else?

ATTY:  No, Your Honor.

ALJ:  All right.

R. 143.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued her decision on August 31, 2016.  R. 18-32.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Arnold met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since September 26, 2013, and she suffered from the severe impairments of diabetes mellitus, asthma, degenerative disc disease status post spinal surgery, lumbar scoliosis, osteoarthritis, depression, personality disorder, and anxiety.  R. 20.  The ALJ found at Step 3 that Arnold's impairments or combination of impairments did not meet or equal any listing.  R. 21-23.

At Step 4, the ALJ found that Arnold had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations.   The claimant can occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds. She must never be exposed to unprotected heights or hazardous work environments.  She can occasionally stoop, kneel, or crouch. She can never crawl. She can frequently balance. She can engage in frequent handling and occasional fingering. She is capable of performing simple, routine tasks and making simple work-related decisions.  She cannot perform production pace tasks.  She can tolerate frequent contact with supervisors and coworkers and occasional contact with the public. She can tolerate occasional concentrated exposure to dust, fumes, and pulmonary irritants. She will be off-task ten percent of the workday.

R. 23.  The ALJ relied on several pieces of evidence in the record, including the following:

- Medical records that showed her knee surgery and her second spinal surgery were successful;

- The numerous examination notes that found full range of motion and normal strength;

- The repeated normal mental status examinations at Transitions;

- The variety of Arnold's activities, including reports that she:

    o regularly took walks, and at least once walked eight blocks to get to a doctor's appointment,

    o repeatedly helped deliver newspapers,

    o repeatedly helped clean her church building,

    o was on her feet all morning on at least one occasion,

    o pulled weeds for two hours at a time in her yard,

    o performed several types of housework, and

    o prepared all of her meals from scratch;

- The opinions of Drs. Smith and Wabner; and

- The opinions of psychologist Dr. Froman, and to a lesser extent the opinions of psychologists Drs. Lanier and Hollerauer.

R. 23-28.  The ALJ noted Arnold's complaints of chronic diarrhea, but found that the condition was adequately treated by the medication dicyclomine and the allowance of 10 percent off task in the RFC was sufficient to address any functional effects of this condition.  R. 27.  The ALJ found that Arnold's contrary testimony and Adult Function Reports were not entirely consistent with the medical evidence and other evidence on which the ALJ relied.  R. 24.

The ALJ found at Step 4 that Arnold could not perform her past work. R. 30.  The ALJ found at Step 5 that Arnold could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines and the opinions of vocational expert Peters-Pagella. R. 30-31.  The ALJ concluded that Arnold was not disabled.

The ALJ also included the following regarding the above-quoted colloquy at the end of the hearing:

> The claimant's representative raised issue with perceived inappropriate questioning regarding the claimant's legal history. The undersigned notes that an abundance of evidence in the record supports a ruling herein without additional discussion of the inconsistencies between the claimant's testimony and other evidence of record underlying the questions at issue. It is not necessary to further respond to or correct the representative's perceptions or arguments beyond the response already contained in the hearing record.

R. 27 (internal citation to the record omitted).

Arnold appealed the ALJ's decision. On August 30, 2017, the Appeals Council denied her request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 1. Arnold then brought this action for judicial review. Arnold's representative has also informed the Court that she filed another application for SSI disability benefits after the adverse decision before the Commissioner in this case, and on October 26, 2017, the Commissioner awarded Arnold SSI disability benefits. Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment (d/e 21).

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ is not required to mention every piece of evidence in her decision, but must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

Substantial evidence supported the ALJ's decision.  All of the evidence listed above on which the ALJ relied—the opinions of Drs. Smith, Wabner, Froman, Lanier, and Hollerauer; Arnold's repeated reports that she walked regularly, delivered newspapers, and helped clean her church building; and Arnold's activities at home including cooking all meals from scratch, house cleaning, and regular yard work—supported her decision.  A reasonable mind might accept this evidence as adequate to support the decision.  Richardson, 402 U.S. at 401.  The decision was supported by substantial evidence.

Arnold argues that the ALJ's RFC finding was not supported by substantial evidence. Arnold argues that the ALJ did not address some evidence. The ALJ is not required to address every piece of evidence in her opinion. She must build a logical bridge from the material evidence to her decision. <u>Clifford</u>, 227 F.3d at 872. The ALJ did that here. Arnold essentially asks this Court to reweigh the evidence. The Court will not do this. <u>See</u> <u>Jens</u>, 347 F.3d at 212; <u>Delgado</u>, 782 F.2d at 82.

Arnold argues that the ALJ did not adequately address her chronic diarrhea in the RFC finding. The Court again disagrees. Arnold testified at the hearing that she took dicyclomine. She told her doctors that dicyclomine helped with her diarrhea, but she did not like to take it and often forgot to take it. R. 969 and 1006. The ALJ could reasonably find that the diarrhea was adequately controlled by medication and was consistent with an allowance of 10 percent off task built into the RFC finding. R. 27. There was no error.

Arnold argues that the ALJ was prejudiced against her because of her criminal history. The Court disagrees. The Court sees no evidence of bias. The ALJ asked about inconsistencies between Arnold's testimony and information in the record. The ALJ must make findings of fact, and therefore, should explore inconsistencies in the record. That is all the ALJ

did.  The ALJ did not rely on, or even mention these inconsistencies in her decision, except in her comments, quoted above, addressing the concerns raised by Arnold's attorney.  The ALJ further followed SSR 16-3p and did not make a credibility finding.  The Court sees no evidence of bias.

Arnold finally raises in rebuttal that the Commissioner found her to be disabled as of October 26, 2017, as proof that she was disabled on September 26, 2013.  Arnold raised this argument for the first time in rebuttal.  Arnold filed her original Brief before this Court on April 9, 2018, long after October 2017.  Arnold could have and should have included this argument in her original Brief.  The issue is waived.  See e.g., Mendez v. Perla Dental, 646 F.3d 420, 423-24 (7th Cir. 2011).

THEREFORE, IT IS ORDERED THAT Defendant Commissioner's Motion for Summary Affirmance (d/e 19) is ALLOWED, Plaintiff Arnold's Brief in Support of Motion for Summary Judgment (d/e 16) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:  March 11, 2019.

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE